*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JASON BENJAMIN SYMONDS,

Defendant-Appellant.

UNPUBLISHED
November 25, 2025
11:05 AM

No. 366966
Calhoun Circuit Court
LC No. 1994-003085-FC

Before: RICK, P.J., and O'BRIEN and MALDONADO, JJ.

PER CURIAM.

Defendant, Jason Benjamin Symonds, appeals as of right the trial court's reimposition of his sentence of life without parole (LWOP) for his first-degree murder conviction. For the reasons provided below, we vacate and remand for reevaluation under the proper framework.

## I. BACKGROUND

On March 3, 1995, a jury convicted defendant of first-degree premeditated murder, MCL 750.316(1)(a), of five-year-old Nicole Van Noty.[1] Defendant was 16 years old at the time of the murder and was tried as an adult. Under applicable law at the time, the trial court sentenced defendant to mandatory LWOP.

---

[1] The jury also found defendant guilty of kidnapping, two counts of first-degree criminal sexual conduct, felony-murder predicated on kidnapping, and two counts of felony-murder predicated on the two criminal sexual conduct convictions. But the trial court at the initial sentencing granted defendant's motion to vacate all of the convictions except for the first-degree premeditated murder count. While defendant had argued that these other convictions should be vacated on double-jeopardy and jurisdictional grounds, the court, while citing *People v Veling*, 443 Mich 23; 504 NW2d 456 (1993), only cited double jeopardy.

-1-

The general circumstances of the murder were recounted in this Court's prior opinion affirming his conviction:

> According to the testimony presented at trial, defendant lured his stepsister's five-year-old playmate [Nicole] into the basement of an abandoned and boarded-up house owned by his father and located near defendant's own home. Once in the basement, defendant sexually molested the victim, and struck her numerous times with the blunt edge of a hatchet, with a wooden dowel wrapped with wire, and with a metal rod, killing her. Defendant then placed her naked body in a black garbage bag and buried her behind the abandoned house. The following day, defendant allegedly incriminated himself to a friend and after agreeing to be interviewed by the police, defendant confessed that he had killed the victim. [*People v Symonds*, unpublished per curiam opinion of the Court of Appeals, issued October 10, 1997 (Docket No. 186002), p 1.]

The crime scene was described as the worst that many of the police officers had ever seen. There was a lot of blood in the basement as well as possible brain matter. Nicole was 38 pounds at the time of her death. She suffered a fractured skull and several injuries on her back. She also had a tooth knocked out, which was associated with tears on the inside of her lip. There also was bruising in the area of her genitalia, which the medical examiner said indicated that Nicole was alive at the time she was sexually assaulted. The medical examiner also testified that there was evidence of particles in Nicole's trachea, indicating that Nicole was still alive when she was buried.

The police interviewed defendant. During this interview, defendant first denied any involvement with Nicole's disappearance. But defendant then stated that he accidently hit her with the hatchet while he was chopping at a tree in the backyard. Defendant said that he then "put her in the basement" removed her clothes, hit her "a couple of times" with a metal stick, put her in a garbage bag, and buried her in the backyard. Defendant eventually admitted to also sexually penetrating her. When confronted with the fact that there was no sign of any blood in the backyard, defendant changed his initial story that he had accidently hit Nicole while chopping at a tree to be that he first hit her when they both were "going towards [the] basement." Defendant explained that Nicole approached him while he was chopping at the tree and asked if defendant's sister was around. Defendant said that she was not, and when he walked in the house, he heard her say something, which "scared" him, implying that this is when he accidently struck her. After carrying Nicole into the basement, defendant said that he hit her with "a little of everything," left her in the basement, and went home to shower. When he returned hours later, he saw that Nicole was still alive and beat her some more before putting her in the garbage bag and burying her. Consequently, although defendant admitted to killing Nicole, he always maintained that the initial hit was accidental.

In a psychological evaluation conducted in March 1995, when defendant was asked whether he had a girlfriend, he never mentioned anyone named Letitia and instead said: "Every female in Battle Creek is a hooker. They mistake sex for love. That's all they are good for anyway. Getting money from you for sex." During defendant's incarceration, he obtained his GED, was accepted into the Calvin University Initiative program, received a bachelor's degree from Calvin University, and received glowing reviews and recommendations from numerous corrections staff.

Almost 20 years after defendant was sentenced to mandatory LWOP, the United States Supreme Court held in *Miller v Alabama*, 567 US 460, 479; 132 S Ct 2455; 183 L Ed 2d 407 (2012), that such sentences when imposed on defendants who were minors at the time they committed their crimes are unconstitutional as cruel and unusual punishment. The Court ruled that because such *mandatory* sentences prevent consideration of the mitigating qualities of youth, they pose "too great a risk of disproportionate punishment" when imposed on juvenile offenders. *Id*. "*Miller*'s substantive holding is that LWOP is an excessive sentence for children whose crimes reflect transient immaturity."[2] *People v Taylor*, 510 Mich 112, 128; 987 NW2d 132 (2022). The *Miller* Court explained the proper analysis that is to occur before imposing a LWOP sentence on a juvenile offender.

In response to *Miller*, the Michigan Legislature enacted MCL 769.25 and MCL 769.25a, in which the *Miller* factors were expressly incorporated into this state's discretionary juvenile LWOP sentencing scheme. *Taylor*, 510 Mich at 126, citing MCL 769.25(6). Under this scheme, if the prosecutor requests LWOP, the trial court must hold a hearing to consider the sentencing factors and other relevant criteria. MCL 769.25(6).

At the *Miller* hearing, the prosecution admitted some exhibits and presented live witnesses who described the horrific and heinous circumstances of the crime.[3] Defendant's exhibits were admitted via stipulation at the beginning of the hearing as well. At the conclusion of the prosecution's proofs, defense counsel moved for involuntary dismissal under MCR 2.504(B). Defense counsel seemed to imply that because the prosecution only presented witnesses who discussed the heinous nature of the crime, the prosecution did not adequately address the *Miller* factors and therefore could not meet its burden of rebutting the presumption against a LWOP sentence. The trial court denied the motion, noting that a number of exhibits—introduced by both sides—were admitted into evidence as well.

Defendant at the *Miller* hearing presented the testimony of Daniel Keating, who was a professor of psychology at the University of Michigan and specialized in developmental science, with a focus on early development and adolescent development. Keating's purpose was to discuss the science that underlined the rationale for the Supreme Court's decision in *Miller*; as such, he did not review any materials specifically related to defendant or his case. Keating explained that human brains continue to develop until the person reaches the age of 24 or 25. He further explained that without a fully developed prefrontal cortex, a person is more prone to impulsive behaviors. Regarding the potential for rehabilitation, Keating testified that there is no evidence to suggest that lying, being nonemotional, or not showing remorse is predictive of the capacity for rehabilitation.

---

[2] The United States Supreme Court held in *Montgomery v Louisiana*, 577 US 190; 136 S Ct 718; 193 L Ed 2d 599 (2016), that *Miller* announced a substantive rule of constitutional law that applied retroactively to cases on collateral review.

[3] The prosecution's exhibits were received by the trial court before the hearing commenced. Pertinently, the exhibits consisted of an April 1995 presentence investigation report, the autopsy report, a May 1995 presentence investigation report, a May 1994 competency and criminal responsibility evaluation, a March 1995 psychological evaluation, defendant's prison misconduct report, and transcripts of the police's interviews with defendant.

Keating also said that an adolescent who has experienced trauma can recover. However, Keating also conceded that while it was possible to have a 16-year-old adolescent be irreparably corrupt, it was impossible to scientifically identify such individuals.

Matthew Mendel, a psychologist, also testified for defendant. Mendel relayed that defendant had suffered physical and sexual abuse while growing up and opined that defendant's assault of Nicole was "connected" with him being sexually abused at a young age. Mendel suggested that, while there were reports of defendant always being terribly mad in his youth, defendant was no longer that same dangerous, impulsive person and that he was fully rehabilitated. Mendel also recounted how defendant explained to him that near the time he killed Nicole, his girlfriend, Letitia, became pregnant. While at first defendant was overjoyed, in subsequent months, he became overwhelmed, used more drugs, and made recent suicide attempts, all leading up to his attack of Nicole.[4] In support of his conclusion that defendant was rehabilitated, Mendel noted, among other things, that in defendant's 29 years of incarceration, he had no record of fighting, stealing, or being impulsive. Defendant received 29 tickets[5] during his 29 years of imprisonment leading up to the *Miller* hearing, but all of the tickets would be classified as minor offenses in the present system.[6]

The court analyzed the five *Miller* factors, finding that factor (1) (defendant's chronological age and its hallmark features) and factor (2) (family and home environment) were mitigating factors. The court found that factors (3) (circumstances of the homicide), (4) (whether defendant might have been charged with and convicted of a lesser offense if not for the incompetencies associated with youth), and (5) (the possibility of rehabilitation) were neutral. The court additionally found aggravating factors. The court was primarily concerned that defendant had not taken full responsibility for the offense; defendant continually "painted the offense in a way that disregarded the premeditation" and predatory aspects of the offense. The court noted that even when recently discussing the murder with Mendel, defendant "didn't say anything about luring the child into the basement" and indicated that he attempted to "comfort her" after the sexual assault. The court noted that nowhere else in the record is there any indication that defendant attempted to "comfort" Nicole. Because of the inconsistencies between what was presented at trial and how defendant presented information to the experts later, the court openly questioned defendant's credibility with Mendel. The trial court noted that its view was supported by other evidence as well, including a 2013 COMPAS report and a 2020 sex-offender risk assessment. A high score in defendant's 2013 COMPAS report indicated that "there may be issues, including justification for criminal behavior, refusal to accept responsibility, blaming the victim, and that

---

[4] Notably, defendant's representations to Mendel were contradicted by other evidence: in defendant's presentence investigation report, it lists that defendant had no history of substance abuse; in the lower court record, there is no reference to defendant mentioning Letitia to anyone else; and during his interview with the police, defendant said that he tried to commit suicide once "a long time ago" but did not "ha[ve] the guts to do it again."

[5] But only 25 tickets were "sustained."

[6] The Department of Corrections modified its misconduct system in 2010, which resulted in the reclassification of many offenses.

there would be a high need . . . to address cognitive issues that [defendant] may have." And in the 2020 sex-offender risk assessment, defendant again minimized his intentions by stating that Nicole simply "followed" him to the basement and that he did not intend to assault or kill her. That same assessment indicated that there were clinical concerns about emotional identification with children, hostility towards women, and deviant sexual preferences. Regarding the clinical concerns about hostility towards women, the trial court recounted defendant's prior statements that all women were "hookers" and only good for taking money and having sex. The court stressed that there was nothing in the record to indicate that his attitude toward women had changed. After balancing all of the factors, the court granted the prosecution's motion to sentence defendant to a term of LWOP.

After the court sentenced defendant to a sentence of LWOP, he moved for a new hearing on the basis of his counsel providing ineffective assistance. Defendant argued that he received ineffective assistance (1) when counsel failed to object to Officer Howe's testimony and (2) when counsel failed to offer into evidence a polygraph result of a witness who testified at the initial trial. The trial court denied the motion, ruling that defendant could not prove the requisite prejudice.

## II. *MILLER* FACTORS

Defendant argues that the trial court erred when it resentenced him to LWOP. Because the trial court made errors in its analysis, we remand to allow the court to analyze under the proper framework.

A trial court's decision to impose a LWOP sentence on a juvenile offender is reviewed for an abuse of discretion." *Taylor*, 510 Mich at 128. A court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). But a court's underlying factual findings are reviewed for clear error. *Taylor*, 510 Mich at 128. A court clearly errs when a reviewing court is left with a definite and firm conviction that a mistake was made. *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015).

The United States Supreme Court has held that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Miller*, 567 US at 465.[7] To address this constitutional deficiency, the Michigan Legislature enacted a scheme for such juvenile offenders who would otherwise be subject to mandatory LWOP sentences. Under this scheme, sentencing courts are to consider the following *Miller* factors:

> (1) the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the juvenile's family and home environment—"from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the

---

[7] The Michigan Supreme Court has extended this principle under the Michigan Constitution to offenders who were under the age of 21 at the time their crimes were committed. *People v Montario Taylor*, ___ Mich ___; ___ NW3d ___; ___ NW3d ___ (2025) (Docket Nos. 166428 and 166654); *People v Parks*, 510 Mich 225, 254-255, 268; 987 NW2d 161 (2022).

homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him"; (4) "the incompetencies of youth," which affect whether the juvenile might have been charged with and convicted of a lesser crime, for example, because the juvenile was unable to deal with law enforcement or prosecutors or because the juvenile did not have the capacity to assist their attorney in their own defense; and (5) the juvenile's "possibility of rehabilitation." [*Taylor*, 510 Mich at 126, quoting *Miller*, 567 US at 477-478.]

There is a rebuttable presumption that a LWOP sentence is disproportionate, and the prosecution has the burden to overcome this presumption by clear and convincing evidence. *Taylor*, 510 Mich at 120. Under this scheme, if the prosecutor requests LWOP, the trial court must hold a hearing to consider the five *Miller* factors and other relevant criteria, including the defendant's record while incarcerated. MCL 769.25(6). While the *Miller* factors are mitigating factors,[8] *Taylor*, 510 Mich at 139 n 25, citing *People v Skinner*, 502 Mich 89, 115; 917 NW2d 292 (2020), the court must also consider any aggravating circumstances, MCL 769.25(7).

Regarding the first *Miller* factor, which pertains to defendant's age, the court found that the factor was a mitigating factor because defendant was 16 years old at the time of the murder. Defendant does not challenge the court's treatment of this factor. Indeed, because the evidence shows that a person's brain does not fully develop until around the age of 25, it was not unreasonable for the court to categorize this factor as "mitigating."

Defendant also does not challenge the court's treatment of the second *Miller* factor, which pertains to the juvenile's family and home environment, from which he cannot extricate himself. Because of the abuse defendant suffered as a child, the court also considered this factor as mitigating.

The third *Miller* factor addresses "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." The court found no facts to show that the circumstances of the offense demonstrated that there should be a mitigation against a LWOP sentence. The court specifically found that defendant

was the only person who has committed this crime. He, alone, is responsible for the crime, and there was 100 percent participation by him, both in the luring of the child, the sexual assault of the child, and the beating of the child. He was not influenced by familial or peer pressures in this particular offense.

Defendant avers that this factor should have been considered as mitigating because he was sexually abused as a child, which Mendel suggested allowed this crime to happen. The court specifically acknowledged this abuse but did not find that it was sufficient to override the prevailing aspect of defendant acting alone with no familial or peer pressures; it therefore found this factor to be

---

[8] Indeed, because the *Miller* factors are mitigating factors, if a particular factor does not militate against a LWOP sentence, then the most it can be considered is neutral. *Taylor*, 510 Mich at 139 n 25.

neutral. Because the record shows that defendant did in fact act alone and acted without any pressure from his family or peers, the trial court did not clearly err by finding that this factor was neutral.

The fourth *Miller* factor addresses a defendant's ability to navigate the court system and whether he may have been charged with or convicted of a lesser offense were it not for the "incompetencies associated with youth." The trial court noted that there was no plea offer available in this case. Thus, it was not a situation where a defendant, because of his impetuousness or inexperience, improvidently rejects an offer and decides to "roll the dice" at trial. The court also recognized that when defendant was interviewed by the police, he was "very able to attempt to assist himself by painting the offense in a way that made him be shown in a light more favorable to the police." The court also found that defendant had "an excellent awareness of the legal system." As a result, the court found this factor to be neutral.

Defendant maintains that the court erred because the record shows that, purportedly because of his distrust of adults, he never asked for an attorney or parent before speaking with the police. First, it is not apparent from the record that defendant's decision to not ask for an attorney or parent was the result of a "distrust of adults." Second, defendant cites no caselaw that stands for the proposition that the failure to ask for an attorney or parent conclusively renders this factor as mitigating. This Court is well aware that many adults also agree to be interviewed by the police without the presence of an attorney. Moreover, while defendant's interview with the police, in which he admitted to killing and sexually penetrating Nicole, was important evidence against him at trial, it was not the only evidence. Significantly, there also was a confession to his friend that was admitted into evidence and evidence that the impressions of defendant's boots were consistent with the footprints that were left where Nicole was buried. Consequently, we are not left with a definite and firm conviction that the trial court made a mistake with its findings related to this factor.[9]

For the fifth factor, which addresses the defendant's "possibility of rehabilitation," defendant argues that the trial court erred in weighing this factor as neutral because he is in fact rehabilitated. In support, defendant relies on the undisputed evidence that he was a model prisoner for the previous 29 years. The trial court recognized that defendant had indeed improved himself while in prison and for all intents and purposes was a model prisoner.[10] But the court also had

_____

[9] We also note that defendant's youth somewhat inured to his benefit because it resulted in the vacation of all the other convictions against him, including convictions of kidnapping and first-degree criminal sexual assault.

[10] While defendant's time in prison was free of violent behavior, it might not be accurate to paint this as being attributable to him being rehabilitated. Defendant was born prematurely and always had a relatively small or slight build. Defendant was 5' 2" when he killed Nicole, and his current height is 5' 4". Further, because of a staph infection in his hip, defendant underwent four surgeries when he was an infant. As a consequence of those procedures, one of defendant's legs is significantly longer than the other, which causes him to walk with a marked limp. Being undoubtedly one of the smallest people in prison, not to mention having a disability that affects

many concerns related to defendant's possibility of rehabilitation that outweighed this positive behavior. The court was concerned about (1) the fact that defendant has consistently failed to acknowledge the predatory nature of his conduct and (2) his history of violent behavior, including using cats to bait dogs and almost killing someone before.[11]

Notably, as defendant identifies, the trial court relied on the fact that defendant has failed to acknowledge his conduct for both finding that this fifth *Miller* factor is neutral *and* as an aggravating factor. This is not permissible because all of the *Miller* factors are mitigating factors, such that if any is not mitigating, at most, it will be considered "neutral." *Taylor*, 510 Mich at 139 n 25. The trial court's treatment of defendant's failure to fully take responsibility for his actions as being related to the fifth *Miller* factor and an aggravating factor, therefore, is erroneous.

The question then becomes where defendant's failure to take full responsibility should best be addressed. Does it belong in the fifth *Miller* factor or should it be considered a separate aggravating factor? Importantly, the fifth *Miller* factor is not whether a defendant is in fact fully rehabilitated—it is whether the defendant has the *potential* for rehabilitation. See *id*. at 126 (stating that the fifth factor is the juvenile's "possibility" of rehabilitation). We conclude that defendant's failure to take full responsibility belongs with this fifth factor. If someone cannot fully accept or acknowledge what he did, then it becomes evident that he will have a diminished capability at rehabilitation. See *People v Harns*, 227 Mich App 573, 579; 576 NW2d 700 (1998) (noting, in a different context, that the Legislature reasoned that "a key factor in rehabilitation is the defendant's willingness to accept responsibility for his conduct"), vacated in part on other grounds 459 Mich 895 (1998); *People v Draper*, 150 Mich App 481, 490; 389 NW2d 89 (1986) (approving of the trial court's conclusion that the failure to accept responsibility for criminal conduct negatively affects the potential for rehabilitation). Therefore, the trial court properly considered defendant's failure to take full responsibility for all of his actions as negatively affecting his potential for rehabilitation.[12]

Defendant also challenges the court's finding that he failed to accept responsibility for his actions. The court noted that even when recently discussing the murder with Mendel, defendant "didn't say anything about luring the child into the basement" and indicated that he attempted to "comfort her" after the sexual assault. The court noted that nowhere else in the record was there any indication that defendant attempted to "comfort" Nicole. Although defendant told Mendel that it would never happen again because of how he now understands the value of human life, due

_____

his mobility, it would not be very prudent of defendant to get into many physical altercations. Thus, while it is definitely a positive sign that defendant has behaved well in prison, it also may be somewhat attributable to him not having smaller people to dominate or combat, such as when he brutally raped and killed five-year-old Nicole.

[11] During defendant's interview with the police, he admitted that he had tried to kill someone else before, but his brother pulled him off the other person before he could finish the act.

[12] Importantly, as noted earlier, this minimization was not limited to when defendant was a minor; it was evident right before this *Miller* hearing when defendant could not fully explain to Mendel how Nicole ended up in the basement or why he committed the crime.

to the various inconsistencies between what was presented in the original trial and how defendant presented the circumstances of the crime to Mendel, the court questioned defendant's credibility with Mendel. The court further relied on a 2013 COMPAS report and a 2020 Michigan Department of Corrections (MDOC) sex-offender risk assessment for its view that defendant continues to downplay his actions.

The court's finding that defendant has failed to fully acknowledge his actions is not clearly erroneous. Defendant asserts that his statements to Mendel show that he did take responsibility for his actions. But, as the trial court noted, defendant could not explain to Mendel the actual circumstances of how Nicole got to the basement. Although defendant indicated to Mendel that he took responsibility, his failure to fully describe his actions says otherwise. Consequently, we are not left with a definite and firm conviction that the court made a mistake.

The other aspect that the trial court considered as adversely affecting defendant's ability to be rehabilitated was his violent past. However, there is no apparent nexus between one's violent past (especially as a child or adolescent) and the *ability* of that person to later become rehabilitated as an adult. Indeed, Mendel opined that the nature of defendant's behavior was not relevant for his ability to be rehabilitated.[13] Accordingly, the trial court improperly considered defendant's violent past as indicative of his inability to be rehabilitated.

Therefore, because the trial court erroneously considered defendant's past in context with the fifth *Miller* factor, we remand for resentencing to allow the trial court to analyze this factor absent the inappropriate component.

Defendant also argues that the trial court erred by relying on other facts when determining that this fifth factor was neutral. Defendant avers that the court improperly relied on the fact that the crime was premediated and violent. Defendant misconstrues what the court was saying. The court was only concerned about the fact that defendant has "failed to take acknowledgment of the predatory nature of his conduct"; in recounting the circumstances of the crime, the court simply was showing how he had acted with premeditation. But the court's concern was not that there *was* premeditation but, rather, that there was no *acknowledgement* of that premeditation.

Consistent with MCL 769.25(7), the trial court also considered aggravating factors. The court identified only two aggravating factors: (1) defendant's failure to fully acknowledge his conduct and (2) defendant's continued hostility toward women.[14] Regarding the first aggravating factor, as previously noted, we agree with defendant that a court abuses its discretion when it treats a *Miller* factor as an aggravating factor. See *Taylor*, 510 Mich at 139 n 25. Therefore, as discussed previously, defendant's failure to acknowledge his conduct should not be considered an aggravating factor.

---

[13] Notably, the prosecution did not present an expert of its own to offer a contrary opinion.

[14] While the court mentioned several different facts when it was discussing the aggravating factors, a fair reading of the court's decision shows that those other facts were cited to support the existence of these two factors.

The trial court also found as an aggravating factor defendant's emotional identification with children, hostility towards women, and deviant sexual preferences. Defendant's prior actions as a child—including calling all women hookers who were good for nothing besides sex—and the more recent 2020 MDOC report reflecting that these areas remain areas of "some clinical concern," demonstrate that the trial court's findings are not clearly erroneous.

In sum, the trial court erroneously considered defendant's unwillingness to fully accept responsibility as an aggravating factor when it should only have been considered under the fifth *Miller* factor as a mitigating factor. The court further considered defendant's violent past under that fifth *Miller* factor, which is not appropriate. Accordingly, we remand for reconsideration under this proper framework.[15]

### III. MOTION FOR INVOLUNTARY DISMISSAL

Defendant argues that the trial court erred when it denied his motion for involuntary dismissal under MCR 2.504(B)(2). We disagree. A trial court's decision on a motion to dismiss under MCR 2.504(B)(2) is reviewed de novo, but the facts supporting that determination are reviewed for clear error. *Samuel D Begola Servs, Inc v Wild Bros*, 210 Mich App 636, 639; 534 NW2d 217 (1995).

MCR 2.504(B)(2) provides:

> In an action, claim, or hearing tried without a jury, after the presentation of the plaintiff's evidence, the court, on its own initiative, may dismiss, or the defendant, without waiving the defendant's right to offer evidence if the motion is not granted, may move for dismissal on the ground that on the facts and the law, the plaintiff has no right to relief. The court may then determine the facts and render judgment against the plaintiff, or may decline to render judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in MCR 2.517.

Assuming without deciding that this rule applies in the context of a *Miller* hearing, "[t]he involuntary dismissal of an action is appropriate where the trial court, when sitting as the finder of fact, is satisfied at the close of the plaintiff's evidence that on the facts and the law the plaintiff has shown no right to relief." *Samuel D Begola*, 210 Mich App at 639 (quotation marks and citation omitted). It is akin to a motion for directed verdict when the matter is before a jury. *Id*.

When moving for dismissal under this rule, defense counsel claimed that the prosecution failed to meet its burden to rebut the presumption that a sentence of LWOP is not appropriate. Defense counsel averred that "[t]hey have solely relied on the horrific facts of [defendant's] crime." While the heinousness of the crime was indeed the focus of the prosecution's live witnesses at the *Miller* hearing, there was other evidence admitted that did not relate to the

---

[15] To be clear, our holding does not preclude the trial court from finding that the fifth *Miller* factor is neutral on remand or that defendant ultimately should be sentenced to LWOP. We simply point out the court's errors to allow it to perform a proper analysis.

heinousness of the crime and instead related to defendant's more recent behavior, including defendant's misconduct report while imprisoned the previous 29 years. Indeed, at the time defense counsel moved for involuntary dismissal, all of the parties' exhibits—including defendants'—had been admitted into evidence. Thus, that evidence is properly considered as well. See *Auto Club Ins Ass'n v Gen Motors Corp*, 217 Mich App 594, 603; 552 NW2d 523 (1996) ("[T]he court examines all the evidence presented up to the time of the motion . . . ."). It is from those exhibits that the trial court was allowed to find that defendant has continued to fail to take responsibility for his actions and that there were present concerns regarding defendant's emotional identification with children, his hostility toward women, and his deviant sexual preference. Because these facts, among others, address some of the *Miller* and aggravating factors, the trial court did not err by denying defendant's motion to dismiss.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was denied the effective assistance of counsel at the *Miller* hearing (1) when counsel failed to object to Howe's testimony and (2) when counsel failed to offer into evidence a polygraph result of a witness who testified at the initial trial. We disagree.

The determination whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel. *Id.* The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. *Id.*

Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich at 578. Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). However, such performance must be measured without the benefit of hindsight. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

Regarding Howe's testimony, defendant takes exception to the portion where Howe opined the following:

> [T]his type of crime is nearly impossible to restore a person to being able to be out in public without extensive therapy, without extensive work. And not having any knowledge of what the suspect in this case has gone through, . . . my understanding is it's next to impossible to commit this type of crime and have sufficient remorse that you could regain . . . your place in society.

Although Howe was an evidence technician in the Battle Creek Police Department at the time the crime occurred, he had been a clinical psychiatric specialist in the military. Howe explained that

-11-

he received his psychological training in the early 1970s. Notably, Howe was never admitted as an expert witness.

When denying defendant's motion for a new hearing on the basis of counsel's failure to object to Howe's testimony, the trial court stated the following:

> Because this was in front of a judge, myself, I was able to suss out what was appropriate whether the person had actually been qualified as an expert and whether or not that there had been sufficient time to put that request to have them testify as an expert on notice and sufficient voir dire as to their credentials.
>
> In this instance even though Mr. Howe did offer some opinion testimony, he was considered by the Court as a fact witness. I know that questions were asked. *I did not in my finding in this case* consider him to be an expert or *use his opinions as part of the basis for my decision*. [Emphasis added.]

Thus, because the record is clear that the court did not rely on any of Howe's opinion testimony, defendant cannot establish the requisite prejudice to prove his claim of ineffective assistance of counsel.[16] In other words, because the trial court did not rely on Howe's opinions, there is no possibility—let alone a reasonable probability—that the outcome would have been different but for counsel's failure to object to the testimony.[17]

Regarding defendant's other argument, it implicates the trial testimony of Joseph Mocko. At trial, Mocko stated that defendant admitted to him to having sex with and killing Nicole. Specifically, Mocko relayed that defendant said that he "took" Nicole into the house and that as he was "doing her,"[18] she started to scream. In an attempt to quiet Nicole, defendant said he tried to put his hand over her mouth, and when that did not work, he hit her in the head a couple of times. According to Mocko, defendant said that he left Nicole and returned later to see if she was okay and that he "didn't mean to do it."

Almost a year before trial, Mocko was examined by a polygraph specialist with the Michigan State Police. The polygraph report stated the following, in pertinent part:

> Test questions:
>
> 1. Did you ever sexually touch Nicole in any way?

---

[16] If it is easier to dispose of a constitutional claim of ineffective assistance of counsel on the ground of a lack of prejudice, that course should be followed. *Strickland*, 466 US at 697.

[17] Defendant on appeal does not even attempt to explain, with the court establishing that it did not rely on Howe's testimony, how there was a reasonable probability of a different outcome had counsel objected.

[18] Mocko surmised that defendant's reference to "doing her" was analogous to having sex with her.

2. Did you do anything to cause the death of Nicole?

3. Is [defendant] telling the truth when he says that you helped him with the death of Nicole?

4. Were you present when Nicole died?

5. Are you now lying about [defendant] telling you that he killed Nicole?

THE EXAMINEE ANSWERED NO TO EACH OF THE ABOVE QUESTIONS

It is the opinion of the undersigned examiner based upon the examination given that this subject is not being truthful regarding this issue.

[All-caps formatting in questions altered.]

The trial court again ruled that the polygraph report would not have affected its ruling. The court first noted that it considered the general effectiveness of polygraph testing to be suspect and that such testing does not have strong evidentiary value. The court further recognized that the report was unclear because the it did not specify which of the five questions Mocko purportedly answered deceitfully. The court stated:

Given the fact that he failed or ended up showing evidence of deceit in a polygraph examination doesn't necessarily change the Court's mind as it relates to the testimony of Mr. Mocko nor in fact is that the only evidence of premeditation in this case. There is a large amount of at least circumstantial evidence that this was a premeditated offense and does not change the Court's opinion as to my finding at the time of the evidentiary hearing.

So I don't find that there was anything in the record that's been brought up in this motion that would have changed my finding that Mr. Symonds should be sentenced to life without parole.

Defendant again does not explain, in light of the trial court explicitly ruling that the evidence would not have affected its decision, how he can establish the necessary prejudice. Significantly, this is not a situation where we, as a reviewing court, have to surmise how a jury might react had certain evidence been introduced at trial; instead, the trial court was the one considering the evidence, and the record is clear that had the court received evidence of the polygraph test, it would not have affected the its decision. As before, defendant has failed to show how, assuming counsel's performance fell below an objective standard of reasonableness, that there was a reasonable probability that the outcome would have been different had the evidence been submitted.

-13-

## V. CATEGORICAL BAR OF LWOP SENTENCE

Defendant in his Standard 4 brief argues that the trial court erred by rejecting his argument that a sentence of LWOP for a person who was a juvenile at the time he committed the crime is barred by Michigan's Constitution.[19]  We disagree.

Before the *Miller* hearing took place, defendant argued that Michigan's Constitution, which provides broader protections than the United States Constitution,[20] categorically bars the imposition of sentences of LWOP on people who were juveniles at the time they committed their crimes.  In the motion, defendant acknowledged that the Michigan Supreme Court in *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014), vacated sub nom on other grounds *Carp v Michigan*, 577 US 1186; 136 S Ct 1355; 194 L Ed 2d 339 (2016), already had ruled that the Michigan Constitution did not impose such a bar.[21]  Defendant averred that the *Carp* ruling was erroneous.

_____

[19] While *Miller* and its progeny stand for the proposition that *mandatory* sentences of LWOP are unconstitutional when imposed on offenders who were minors whey they committed their crimes, defendant's position is that *any* sentence of LWOP is unconstitutional for those offenders.

[20] Because the United States Constitution prohibits "cruel *and* unusual punishments," US Const, Am VIII (emphasis added), while the Michigan Constitution prohibits "cruel *or* unusual punishment, Const 1963, art 1, § 16 (emphasis added), the Michigan Supreme Court has interpreted our state constitution as providing broader protection than the federal counterpart. *Taylor*, 510 Mich at 124 n 9.

[21] The Michigan Supreme Court had two pertinent holdings in its opinion: (1) *Miller*, as a new procedural rule, was to be applied prospectively, and (2) Michigan's constitution does not categorically bar LWOP sentences for minors. *Carp*, 496 Mich at 528.  The Unites States Supreme Court, when it vacated that judgment, remanded to the Michigan Supreme Court "for further consideration in light of *Montgomery*[, 577 US 190]." *Carp*, 577 US at 1186.  Although the United States Supreme Court's order purported to vacate the judgment in its entirety, there is no principled reason to think that was the case.  The United States Supreme Court has no authority to interpret a state's constitution and therefore had no reason (let alone the authority) to disturb anything other than the federal issues the Michigan Supreme Court addressed.  See US Const, art III, § 2; *Dep't of Mental Hygiene of California v Kirchner*, 380 US 194, 197-198; 85 S Ct 871; 13 L Ed 2d 753 (1965) (stating that the Court would not have jurisdiction to hear a case resolved solely on state-law grounds); *Minnesota v Nat'l Tea Co*, 309 US 551, 557; 60 S Ct 676; 84 L Ed 920 (1940) ("It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions.").  Further, *Montgomery* simply held that *Miller* constituted a substantive rule of constitutional law that is to be applied retroactively. *Montgomery*, 577 US at 212.  That opinion has no applicability on our Supreme Court's holding related to whether Michigan's constitution categorically bars LWOP sentences for minors.  As such, the Michigan Supreme Court's decision in *Carp* regarding our state's constitution remains good law, despite the general language used in the United States Supreme Court's order.  See also *Montario Taylor*, ___ Mich at ___ n 2; slip op at 4 n 2 (CLEMENT, C.J., dissenting) ("*Carp*'s holding that the imposition of LWOP on a juvenile offender does not violate Const 1963, art 1, § 16 still stands."); *People v Taylor (On Remand)*, unpublished per curiam opinion of the Court of Appeals, issued March 9, 2023 (Docket No.

-14-

In the ensuing motion hearing, defense counsel conceded that the current state of the law did not support her position and noted that she was raising the issue simply to preserve the issue for appellate relief.

In his Standard 4 brief, defendant substantially copies word-for-word the same verbiage from his counsel's prior motion, including the acknowledgment of *Carp*'s holding. Notably, on appeal, he does not explain how the trial court erred by denying his request for a categorical bar when counsel conceded in the trial court that the current state of the law did not support her position. Because counsel acknowledged in the trial court that the current interpretation of Michigan's constitution does not support a categorical bar on LWOP sentences for minors, we fail to see how defendant is entitled to any relief. To the extent defendant's position on appeal can be viewed as a request for this Court to rule contrary to our Supreme Court's *Carp* opinion, he has identified no authority allowing this Court to do so. Indeed, it is well established that this Court is to follow prior decisions of the Supreme Court even if those opinions have become obsolete, *State Treasurer v Sprague*, 284 Mich App 235, 242; 772 NW2d 452 (2009), and even if this Court anticipates that our Supreme Court will change the law, *People v Mitchell*, 428 Mich 364, 369-370; 408 NW2d 798 (1987). Accordingly, like the trial court, we also reject defendant's argument.

## VI. CONCLUSION

The trial court erred in its analysis of the *Miller* factors. First, the court erroneously considered defendant's violent past as being indicative of his ability to be rehabilitated. Second, the court erroneously considered defendant's continued failure to take full responsibility for his actions as an aggravating factor when it only applies to the fifth *Miller* factor. We therefore vacate defendant's sentence and remand for the trial court to reevaluate its analysis under the proper framework. We retain jurisdiction.

/s/ Michelle M. Rick
/s/ Colleen A. O'Brien
/s/ Allie Greenleaf Maldonado

---

325834), p 11 (noting that *Carp* was only vacated with respect to its ruling related to the retroactivity of *Miller*).

# Court of Appeals, State of Michigan

# ORDER

PEOPLE OF MI V JASON BENJAMIN SYMONDS

Docket No.    366966

LC No.        1994-003085-FC

Michelle M. Rick
Presiding Judge

Colleen A. O'Brien

Allie Greenleaf Maldonado
Judges

For the reasons stated in the opinion issued with this order, we REMAND this case for further proceedings.  We retain jurisdiction.  After the remand proceedings conclude, we will review the decisions that the trial court made during those proceedings and consider any remaining issues in this appeal.  Any challenges to the trial court's decisions on remand must be raised in this appeal.  Therefore, the parties and the trial court must not initiate a new appeal from an order entered on remand within the scope of this appeal.  The Clerk of the Court is directed to reject the initiation of a new appeal from such an order.

Appellant must initiate the proceedings on remand within 28 days of the Clerk's certification of this order, and the trial court must prioritize this matter until the proceedings are concluded.  As stated in the accompanying opinion, we vacate defendant's sentence and remand for the trial court to reevaluate its analysis under the proper framework. The proceedings on remand are limited to this issue.

The parties must serve copies of their filings in the trial court on this Court.  Appellant must file with this Court copies of all orders entered on remand within seven days of entry.

Appellant must ensure the transcript of all proceedings on remand is filed in the trial court and this Court within 21 days after completion of the proceedings.

_____
Presiding Judge



A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

_____November 25, 2025_____
Date

_____
Chief Clerk